Good morning. May it please the court. Brian Sanford on behalf of the plaintiffs and appellants. The agreement is, or was, that the government would pay TruConnect a monthly fee for every activated phone in the hands of a customer. The plan has pledged that TruConnect billed the government for every phone it considered was activated regardless of whether it was in the hands of a customer. Also pledged, and we have witness, first-hand knowledge, of actual phones in his hands being activated, not in the hands of a customer, spreadsheets of phones activated, not in the hands of customers. Well, Mr. Sanford, do you agree that these allegations are subject to a heightened pleading requirement under Rule 9? Yes, fraud. So, these fraud allegations have to have specific factual allegations to show that a claim was actually made to the government for payment. What are the allegations that connect the dots to the claim actually having been made? Statements by TruConnect that it billed the government for activated phones. A spreadsheet that has on the spreadsheet billing activation date, which is in the pleading, I think it's paragraph 78, billing activation date, billing in the spreadsheet, activation date, and then showing little or no activity on the phone. So, how does that demonstrate a false claim? Where does little or no activity violate the guidelines? So, there has to be enough usage on the phone to be active, and it has to be in the hands of a customer. Where does it show that it has to be in the hands of the customer? That is part of the agreement. I believe that's what's pled. I mean, so one concern, you know, one of the allegations you make is about repairs, and so there are these phones that are being repaired, but the period is over, I'm sorry, over a 60-day period of time. So, how do we know from your allegations that the phone was being repaired, but it actually is in the hands of the customer? Just to give one example. Okay, because the phone's in the hands of, because Reggie Salgado has the phone in his hands, right, during that period, and the billing period is 30 days or 31 days monthly. So, it's not 60 days. The regulations say 60 days at the time that this action was filed. So, in order to prove no usage for a certification to the government, it was a 60-day period of time. So, where in your allegations do you show that that phone in Reggie's hands was never in a customer's hands over a 60-day span, such that a false claim was made to the government? That we don't have that. So, that's, and I circle back to the Rule 9 requirements. What are your allegations that show that fraudulent claims were being submitted to the government? What we have is, we don't have the 60 days. We were not allowed to have the 60 days. We have 38 days, which is all we were allowed to look at, right? So, if you have 38 days and you have little or no activation, not in the hands of customers for the 38 days, then... Then there's a possibility that in the other remaining days that it could be in the hands of the customers, and you haven't made out a claim. Yeah, and that's a possibility, but it's not a plausibility. In fact, the plausibility is that it's just the opposite, and that's our standard, is plausibility, not possibility. The possibility is that there's no fraud. The plausibility is that there is fraud. That's our standard. The fact that we don't have the actual statements at the end of the day shouldn't stop it. It's like an argument saying, well, it's the fall that doesn't kill you. It's the ground at the end of the day. So, we argue that there is enough there for plausibility. Okay. So, for the retaliation, the only issue is knowledge of the decision maker, and we believe we have sufficient, some evidence that they had knowledge, a statement that it's the department heads that made the decision, and the department head at the time was chief operations officer, and that person knew about the protected activity. So, we can connect the dots. What did that person, this is Wallace, is that? Yes, Don Wallace. So, what did he have knowledge of about the activity? Specific emails from Reggie McDonald and conversations with Zimbrano about the fraud. The emails talk about churning, a need for investigation. Well, the email... So, I was actually looking at this. The email that I saw to Mr. Wallace was that he found, that Mr. Salgado found evidence to explore the sales techniques of TOP. How does that convey that there's fraud or something going on? Why is that sufficient to convey that there's something fraudulent happening? Well, the concern is with those teams, but it's not just the concern with the teams. He talked about low usage that encouraged an investigation, and more than once, he mentioned concern about churning. Is there any... The only email that I saw to Wallace was that one email with that one line. Are there other emails that you could point me in the record that would show that Mr. Salgado was conveying other concerns to Mr. Wallace? Yeah, I'll have to give it to you. I don't have it here, but I believe there's an email that says, concerns of low usage encourage investigation, concerns about churning. And then a reply email said, okay, I won't talk about churning anymore. So, I can find that for you in the record. And your view is that using the word churning is enough to convey that there might be fraudulent claims being filed? Yes. Okay. In addition, I believe that there were conversations in their declarations directly with Mr. Wallace about concerns of fraud, such as, I don't wanna be involved in doing anything wrong with the government. Well, there were conversations with Mr. Berger about that. That's true. I'm not... You were bringing up Mr. Wallace as a decision maker, so that's why I've been focusing on him. So, yes. So, if you have information specific to Mr. Wallace, unless... Do you think Mr. Berger was a decision maker himself? I do. I think that he was another vice president. I think they were all decision makers. A decision maker in the firing decision for your clients? I do. This would be the first that I'm hearing this. Did you brief that? Indirectly, if you look at... I think the jury can use common sense. Common sense is that in a small business, the people at the top talk, especially about who's getting fired. If you're only talking about dozens of people, it is not uncommon. That together with the emails, with the conversations, it is reasonable to infer that people talk at the highest levels. Maybe not just on itself, flat out. Can I ask... But adding that together. Yes. As I understand it, Mr. Berger wasn't deposed. Mr. Wallace wasn't deposed. So, we don't have anything direct in the record to show what they knew or understood this potential fraud to be. Why was that? Discovery battles. Okay. So, we're left with... You're asking this panel to just kind of grasp at different areas and make a lot of inferences that this was discussed and the decision makers knew about it and used that as a basis for firing. Yeah. I think there are a lot of inferences there. I don't think you need to use all of them, but they're all there. The clearest one is with Mr. Wallace. So, that's not hard. I mean, that's not a hard connection. So, the churning email to Mr. Wallace is the clearest inference that that email resulted in your clients being fired? Yes. Okay. Of course, we have the other facts leading up to it. Well, that's what I'm asking for. Because I... I'm not gonna pour through the record to find your facts. You tell me what are the most important facts that we should consider to determine the retaliation claim. Okay. So, the fact that... The evidence that they're participating in fraud, the evidence that it's the two brothers that are... That's a conclusion. I think we have some evidence. Okay. I do. I think... And it's in the pleadings, but we back it up with actual sworn testimony. So, then conflicting testimony about who the decision maker is, which there's case law that says, if you give conflicting testimony, that's some evidence of pretext, some evidence of... We don't have to believe what they say. There was a case that the court cited itself, FTC versus Clearing House, where summary judgment against the president of a company for fraud. The president says in their declaration, I didn't know about the fraud. And they said, well, there's all those circumstantial evidence. And your statement, I didn't know about the fraud, is conclusory. So, the fact that Johnson brothers say, we don't know, itself is conclusory. So, all of this should be put into the mix. And if you put it into the mix, the totality of the circumstances, a jury can consider they knew. You start making complaints to several people, four or five people, two of them are sea level, and then two days later, you're terminated. So, I'll reserve the rest of my time. Thank you. Good morning, Your Honors. Tom Freeman on behalf of True Connect. I wanna call attention to... There is a huge gulf between raw activation data and billing the government in a regulated program that happens to be the only business of True Connect. There are no facts alleged that show that the plaintiffs have any knowledge whatsoever about what type of compliance work is done by True Connect before the government is billed. They're simply assuming that everything, that every phone that's activated is going to result in a bill for that entire period with no attempt whatsoever to try to comply with the regulations. And that's not... What's implausible about the allegation? Well, what's implausible is there's no connection between these two. To be a whistleblower, you have to have access to facts, right? Well, not always. You don't have to... I mean, if so, then a fraudster could make sure that there was one piece that nobody else ever learned and be insulated. That's not the law. There has to be a plausible allegation. And here we have people who were inside who say, look, we got these patterns of phones that are broken and show very little activity in an effort to develop a robocall or robotex program, suggesting that the company understood, as you just said, it's only business is collecting on this lifeline program. And so the company is not illogically motivated to try to generate claims for which they can collect from the government. That motivation is not hard to infer, so it's at least plausible. And you have a record of lots of of phones that at least seem to have very little activity. And so just because the plaintiffs who don't have access to specific billing submissions to the lifeline program can't cite chapter and verse, that doesn't make the allegation implausible, does it? How? I think it does. I think it doesn't satisfy the standard here is higher. And that's important because these types of claims are not only expensive to defend against, but they carry a stigma. And the requirement in the Ninth Circuit is if you cannot show specific requests for payment that are false, you have to come up with reliable alleged facts showing reliable indicia that leads to a strong inference that claims were actually submitted. Well, you just said that's their business. So we know claims are actually submitted. And you're asking to accept an effect on faith because there's no proof of this either, that the company carefully screens out all of these phones that have next to no activity, even though there is at least an allegation the company developed or was trying to develop programs to make sure that these phones had a minuscule amount of activity to keep them alive so they could be billed for. How is that implausible? Well, it's implausible because you there's because you cannot just assume that just because phones are turned on when they're allowed, there's usually fire. Well, that's that's permitted as an allegation because it's not implausible. The 9B requirement makes sure that the defendant has enough knowledge to be able to defend. But with the information uniquely in the possession of the defendant, I'm not sure that it's a mystery to defendant as to what this allegation is about. They're saying, look, you got all these phones that are broken and in the possession of the repair shop or have very little activity for extended periods of time. So the ball's in your court to figure out, OK, did we submit claims for any of those? And I'm not sure why we accept on faith that, no, the company never submitted a claim for anybody that had a broken phone. No, the question, I think, Your Honor, is whether this plaintiff has access to information other than purely a guess. But well, stop, stop right there, because that's part of the problem. As I just said, a defendant can't insulate itself simply by making sure that nobody outside has access to information. The question for me is whether they've shown enough smoke or alleged enough smoke to lead to a plausible inference that there's fire, that the company did, in fact, because that's its business, submit as many claims to the Lifeline program for payment as it could. Well, Your Honor, first of all, and I do want to move on because I may not be very persuasive on this. It seems like, however, I do want to point out a couple of things. One is that they don't allege anything other than pure activation, which is legal, which is not precluded. And one of, you know, one of the reasons they have been the broken phones aren't an activation issue. An issue is how could these customers be using these phones if, in fact, they were broken and not in the possession of the customer? Well, Your Honor, you're assuming that just because the phones were not deactivated, there are many reasons phones are not deactivated. But the rules don't require deactivation. And one of the reasons is because of the inconvenience to the customer. If the phones get deactivated and, you know, every hoop you put the company through will have an impact, one, on competition, because the FCC is always in when it sets out these rules, it's weighing what can we do to encourage competition here? What can we do to encourage providers to enter the market? And and also what can you know, for instance, there's letting getting these phones out in the hands of eligible eligible households is a goal. So the rules which were not violated here are not alleged to be violated, are geared towards weighing that. You know, the government had programs during the covid lockdown to keep businesses alive and paid out billions and billions of dollars. And now we look back and discover that a huge percentage of that turns out to have gone in strange directions. You're asking us to accept that nothing happened here that goes in strange directions, even though there are allegations that the company was motivated, which you don't deny to submit claims because that was their business and might have been induced or or stretched a little bit to bill, even for these phones, because after all, they had this effort to try to make sure that as many phones were active as possible. Well, I do deny it, Your Honor, because the company has a very strong incentive not to not to violate the law because this is their entire business. And that leads to another point in which, you know, the the trial court took judicial notice of the subpoenas that were issued in this case. And those subpoenas, the first one was issued before the complaint was filed, the second one after. And those subpoenas addressed in great detail all of these issues. They addressed the usage issues, street teams. They demanded loads of documentation. And there's no allegation that the government ever. So it shouldn't be hard to respond to discovery requests in this case because you already gathered all the information. Well, Your Honor, you're talking about this. This supports the notion that a civil suit brought under the False Claims Act should be strangled because the government elected not to pursue it itself. There's a strong inference that the government would have if it found a violation after going through an investigation. That's not simply a matter of not intervening. They conducted an investigation and required massive productions here. And they and they never clawed back any money. They never refused to pay any money. That should support a strong inference that there was no fraud. And the strong inference requirement is, on the other hand, the proposition that if the government elects not to proceed, or to take responsibility for the case, that that is an inference that we can apply against the private plaintiff. So I want to draw a distinction here between. My question is narrow. Is there any authority to support the proposition that we can consider what you just argued? The logic is in the is in the Universal Health Services versus U.S. XREL Escobar at 579 U.S., 176, 195. Now, this is not a direct. This is not direct. But what they held in that case was that if the government, no, this had to do with materiality and an admitted violation of the rules. And then the court held, look, if the government paid despite their knowledge of the violation, then that is very strong evidence that the violation was not material. Well, here it's a similar analysis. Now, we're not just talking really can't emphasize this enough. We're not just talking about not intervening. We don't know that. I mean, if the government paid despite having knowledge of the violation, that doesn't sound like the situation at all. Well, I'm not sure I know. The government investigated, investigated, and they never clawed back the money. If that should lead to an inference that that there was no violation, especially here where you don't have any any evidence of what was done at the billing. And then in the summary judgment motion papers, the evidence was presented that that True Connect has a certainly has a compliance department. It has employees specifically dedicated to this. They constantly take people off the rolls when their usage goes underneath the required levels. And in 15 years, they have a perfect record. They have never been found to violate. Now, we're talking about a very regulated business here that has to face government audits all the time. So to say that, well, they have an incentive to make money, and so therefore they have an incentive to falsely seek it. I think I don't think that's correct. I don't think you can make that inference. Let me, was there evidence presented in the summary judgment that the example cited in the complaint for what I'll call trivial or minimal, not trivial, minimal usage, that in fact, your client didn't make lifeline claims for those customers? OK, well, two points. One is that that wasn't at that point, that wasn't relevant. So that was not part of the record because the only thing remaining was the retaliation claims. So so we have no evidence that, in fact, bolsters the allegation that you're giving to us that the company has such a great compliance department that it did not, in fact, submit claims to lifeline for any of these customers. Well, I would submit that you have to allege facts more than just guessing based on usage data. You know, the usage data showed that the case that Mr. Salgado was making was that True Connect was being ripped off by the handset makers or by the people who were distributing those handsets. And they were the ones who were churning True Connect. And the reason True Connect would be harmed by that is because they could not. And, you know, when once there's once it goes through the compliance process, they would not be claiming they would not be claiming reimbursement from people who were not eligible and not enrolled in the program. You know, the enrollment in the program is not done by the private party. It's done by the state of California. So these these the people were handing out these handsets and they churned it. They overdid it. And by giving them this, this was the theory that that Mr. Salgado had. I don't know if he was correct or not, but that was the theory he had, is that they were giving it out to people who would never qualify. And so they'd never be enrolled in the program by the state. And I get that, but that doesn't contradict the allegation being made by plaintiffs that, in fact, the company wanted to be careful not to or preferred not to hand out phones to people that they weren't going to get reimbursed for, but were motivated to get reimbursed for as much as they could. And hence, the allegation is that they developed these programs that had minimal usage simply to keep an account alive so they could be billed for a separate problem than whether the customer qualified under the financial guidelines for a lifeline payment. Suppose you got a customer that does qualify. Well, lifeline won't pay if that phone isn't active. So what's implausible about the allegation that Crew Connect did whatever it could to make sure there was activity it could lay claim to? So I would submit, Your Honor, that you're turning the standard on its head. They're the ones who have to allege facts that support a strong inference that false billing occurred. False billing doesn't require a strong inference. 9B gets to a different situation. But I'm not sure. Well, no, Your Honor, this is the standard under the IBEED case that applies in false claims act cases. And that is how, you know, there are other circuits that have a stricter standard, and they require that you actually point to false billing, that you need to be that type of an insider to do it. The Ninth Circuit has a lesser standard, but it's still a very strong standard. It's you have to show a scheme to submit false claims paired with reliable indicia that lead to a strong inference that false claims were actually made. Now, you can assume. Can I ask, we've talked about low usage. Is low usage a false claim? You know, if someone actually was using the phone, but only for a minute at a time or two minutes at a time, would that be the submission of a false claim? No, absolutely not. And that is highly relevant. And to this, because, you know, it's. Does the record indicate some distinction between low usage and non usage or or or ferret out whether the low usage is the proper type of low usage as opposed to something manufactured? No, I think all that they allege is some raw data that was put together from like the month prior. And there's there's no allegation. There's no allegation that actually shows a violation for submitting for submitting payments that have no usage and low usage is usage as long as it complies with the regulation. And then again, and that again goes to it's the FCC that sets these for whatever reasons they have. It sets these rules and says that, no, if it low, if you have low usage here, you're still entitled. It's 60 day period, whatever it is, you're still entitled to payment and they have their own reasons for doing that. I submit that one of the reasons is, is that there's a great care that that these phones get out and they're used by households that need them. And can I ask if you're running over a little bit, but I wanted to ask about the retaliation claim. What is your understanding of what Mr. Wallace knew of about about these concerns that Mr. Salgado had raised? Well, I think your honor has it. The only, the only allegation is based on that email. And that email is all about a fraud against true connect. The churning, the term churn has no application to, to the claims in this case. It has to do with the handsets and being in true connect, being charged for the handsets. So there was no, there's no, he had no knowledge of a claim that the company was engaging in fraud. And indeed in his deposition, Mr. Salgado said he had no thought that the company was engaging in fraud until after he was terminated and after he hired, hired a lawyer. So it even, you know, even looking at it, Mr. Wallace, Mr. Mr. Wallace didn't have, you know, there was no claim made to him that true connect was doing anything wrong. It was all about top, the, the, the contractor doing something wrong to true connect. Okay. Let me see if my client, my colleague. Thank you. Thank you very much. So thank you. Let me just briefly address several issues.  Salgado. Can you raise the mic a little bit? Yeah. Mr. Salgado did talk about in the depositions, serious concerns about giving false billing to the government. Not a lawyer didn't know what the legal term fraud is later on says, okay, that is fraud. The, the, of course there is no inference of given by the government agency deciding not to take a case. In fact, if you talk to them, they will say, we are not saying one way or the other, and their actions are, and they give strict instructions. You find anything out, you let us know. So there isn't any inference. The statute itself recognized that that would be a problem. That it was passed to the problem of a government agency not going forward was addressed by the act when it was passed during the civil war. They found for whatever reason, we're not going to rely on government agencies, not going forward for a myriad of reasons, some good, some bad. And so Congress said, we're going to empower private citizens with the right to proceed, even if a government agency concludes there is no fraud. That's the qui tam. That was the whole purpose of the statute from the beginning. Mr. Sanford, can I ask you about this low usage point that we've been raising?  In your brief, I think there's something where you say that 13% of all subscribers show zero to one minute of usage. 13% is, you know, it's a chunk, but it's not the majority. Why should we take from that, or if I take it, you're arguing that we should be able to infer fraudulent claims from that. What, what is it about the 13% of the low usage that would suggest that something fraudulent is occurring? So according to Reggie Salgado, who's had years of doing, dealing with Lifeline and complying and looking over all the data, this is all highly unusual. This is red flags going off all over the place. And not just with the 13%, with a lot more percentages, which I think is, if it's not in the brief, it's in the complaint. So what he is saying is, he specifically says the standard, what, what he has been seeing for years is as soon as a low-income person gets a phone, they burn up the phone for the first few weeks. There is not low or no usage. It's just the opposite. And so seeing low or no usage for under a minute for 13% and under only a few minutes for many more is just not what you see for even a few weeks, let alone 60 days. And so that coupled with, because this is a Lifeline program, we can presume that all, you know, all or most of these claims are being submitted for reimbursement. That, that's the nature of your allegation. Yes, because on more than one occasion, True Connect said, we bill for every activated phone. So then the only question is, is it in the hands of somebody doing the 60 days or not? So we have, that is the evidence that is there. And of course we got, we have, you know, we, there can be exceptions to exceptions to exceptions, excuses after excuses after excuses. But I think that is for a summary judgment or trial, not pleadings. And of course we have the issue for summary judgment. It all comes down on the retaliation. It's just the knowledge of the person. Did you, did you, were you able to figure out any other record sites that related to Mr. Wallace as far as what, what else he might have known other than that email that I did not look on during the break? And I will look. So if it didn't, if it didn't make it into the record, I'll send a letter. Oh, the record site is 3 ER 358 through 361. I don't know if it's our volume or their volume three, because we both have volume three, we'll look it up. Okay. Thank you. Thank you. And counsel, thank you both for your helpful arguments. That matter will stand submitted.
judges: CLIFTON, SANCHEZ, Korman